1    Mani Sheik (SBN 245487)
2    Kimya Liaghat (SBN 328730)
     SHEIK LAW, INC.
3    526 Third St., Ste. A
4    San Rafael, CA 94901
     Tel: (415) 205-8490
5    Email: mani@sheiklaw.us
6    Email: kimya@sheiklaw.us

7    Attorneys for Plaintiffs
     Wingsail Holdings, LLC and
8    Yunfei "Kristy" Bai

9                   **UNITED STATES DISTRICT COURT**

10                 **CENTRAL DISTRICT OF CALIFORNIA**

11   WINGSAIL HOLDINGS, LLC, a          Case No. 8:23-CV-02398-JWH-DFM
     Washington Corporation, and
12   YUNFEI "KRISTY" BAI, an            **SECOND AMENDED COMPLAINT**
13   individual,
                                        **1. Breach of Fiduciary Duty**
14          Plaintiffs,
                                        **2. Constructive Fraud (Cal. Civ. Code
15          v.                             § 1573)**

16   ANDREW POLSKY, an individual,      **3. Fraud (Cal. Civ. Code § 1710)**
     and SEFED, a California
17   Corporation, and DOES 1 through    **4. Promissory Estoppel/Waiver**
     10,
18                                       **5. Rescission and Declaratory Relief**
            Defendants.
19                                       **6. Conversion**

20                                       **7. Theft – Cal. Pen. Code § 496(c)**

21                                       **8. Restoration of Property Pursuant
                                            to Cal. Civ. Code § 1712**
22
                                         **9. Unjust Enrichment/ Constructive
23                                          Trust**

24                                       **10. Accounting**

25                                       **11. Unfair, Unlawful, and Fraudulent
                                             Business Practices (Cal. Bus. &
26                                           Prof. Code § 17200 et seq.)**

27                                       **DEMAND FOR JURY TRIAL**

28

─────────────────────────────────────────────
SAC OF WINGSAIL HOLDINGS LLC AND YUNFEI "KRISTY" BAI

Plaintiffs Wingsail Holdings, LLC ("Wingsail") and Yunfei ("Kristy") Bai ("Bai" and, with Wingsail, "Plaintiffs") hereby file this Second Amended Complaint against Andrew Polsky ("Polsky") and SEFED, a California corporation, alleging as follows.

## I.    JURISDICTION AND VENUE

1.    This Court has subject matter jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. section 1332 because there is complete diversity of citizenship between Wingsail (Washington) and Bai (foreign national), on the one hand, and Polsky (California) and SEFED (California) on the other hand, and more than $75,000 is in controversy in this action, exclusive of interest and costs.

2.    Venue is proper in this Court pursuant to 28 U.S.C. section 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District, or a substantial part of the property that is the subject of the action is situated in this District, and because at least one of the Defendants resides in this judicial district.

## II.    NATURE OF THE ACTION

3.    Polsky, individually and through SEFED (as well as a complex network of corporate entities and holding companies designed to obscure true ownership), engaged in a series of deceitful actions to induce Wingsail—and its 100% owner, Bai—to invest nearly $1 million in Alter Management, LLC ("Alter"), a startup business that Polsky controls, promising that Wingsail would ultimately own 65% of Alter, as well as receive annual profits and distributions from Alter on a priority basis amounting to at least 8% annual interest on Wingsail's outstanding principal investment, which would accrue and be paid when Alter was financially able to make the distributions. However, when Polksy made these representations to induce Wingsail to invest, he never intended to make Wingsail the owner of Alter. Instead, Polsky undertook a string of actions and corporate "shell game" to prevent Wingsail from ultimately receiving the business interest it bargained for. Polsky unlawfully took control of Wingsail's 65% interest in a business that has become extremely successful and profitable, with an approximate present net worth believed to be in excess of $45 Million. Wingsail has not been paid the distributions that are owed to it. Polsky

currently holds all of the subject business property and profits in constructive trust for the benefit of Wingsail and Bai. Wingsail and Bai thus seek to vindicate their rights and bring claims based on breach of fiduciary duty, fraud, conversion, unjust enrichment, unfair business practices, theft. recission, for an accounting and other legal equitable claims.

### III.   PARTIES

4.    Plaintiff Wingsail is a Washington State limited liability company with its principal place of business in the State of Washington.

5.    Wingsail is 100% owned by Bai, who is a foreign national.

6.    Defendant Andrew Polsky ("Polsky") is an individual and resident of the State of California, County of Orange.

7.    Defendant SEFED, formed on or about November 13, 2018, is a California corporation with its principal place of business located at 3857 Birch Street, Suite 12, Newport Beach, CA 92660. Polsky is SEFED's "Organizer," "Chief Executive Officer," "Secretary," "Chief Financial Officer," and "Director," and is also an owner.

8.    At all times relevant to the allegations of this amended complaint, Defendants, and each of them, were aiding and abetting each other and/or acting as the agents, servants, employees, alter egos, or successors or predecessors in interest of each of the other Defendants, and were acting within the course and scope of such relationship with the knowledge, consent, permission, authorization, and ratification, either express or implied, of each of the other Defendants in performing the acts or omitting to act as alleged in this amended complaint.

### IV.   GENERAL ALLEGATIONS

9.    Beginning in approximately October 2013, Polsky was President of MCAP Holdings LLC ("MCAP"), which offers foreign visa investment services to foreign nationals seeking to obtain a visa through one of the various foreign investment-based programs of the U.S. Government (e.g., EB-5 and E2). Fu-Shen "Max" Chang ("Chang") was Polsky's business partner in and the Manager of MCAP.

10.   Polsky was introduced to Bai (and Wingsail) through Chang in or around

April 2018. Polsky was seeking capital to enter the business of behavioral and mental healthcare and drug rehabilitation. Chang had built a relationship of trust with Bai such that Bai could and did trust Polsky, in reliance upon Polsky being Chang's business partner and President of MCAP.

11.    Polsky promised Bai that she would receive (through Wingsail) a significant majority ownership share in Alter and thereby be eligible to obtain a U.S. visa through the E2 visa program, which requires the foreign investor to maintain a majority interest in the U.S. company (in this case, Alter). Polsky promised Bai that in exchange for her seed capital invested in Alter, Bai would receive 65% of the membership interest in Alter, along with all the rights and entitlements that accompany such a majority interest, as required by the E2 visa program, as well as annual profits and distributions from Alter on a priority basis amounting to at least 8% annual interest on Bai's outstanding principal investment, which would accrue and be paid when Alter was financially able to make the distributions. Based on Polsky's representations, Bai was expecting that Wingsail would receive the membership interest in Alter that Polsky was promising, as well as be paid the annual distribution payments Polsky was promising once Alter became financially able to make the payments. Bai was also expecting that, because of and through her majority interest in Alter, she could apply for an E2 visa.

12.    On or about July 27, 2018, Polsky, acting individually and on behalf of Alter as its principal, agent, and manager, drafted and presented Chang and Bai an Alter Operating Agreement, which provided that Wingsail would be the sole seed capital contributor to Alter and would receive a 65% membership interest in Alter, including all the rights and entitlements that accompany such a majority interest, as required by the E2 visa program. Polsky, leveraging Chang's position of trust with Bai, also promised Wingsail and Bai annual profits and distributions from Alter on a priority basis amounting to at least 8% annual interest on Wingsail's outstanding principal investment, which would accrue until Alter was financially able to make the distributions. However, at the time Polsky made these representations and promises to induce Bai to invest in Alter, he never

intended on keeping his promises to Plaintiffs, but instead intended to get Plaintiffs to fund the startup and eventually take over their ownership of Alter.

13. In or about July 2018, based on Polsky's promises and assurances, Wingsail (through Bai) entered into a Management and Investments Agreement with MCAP (of which Polsky was a member and officer—President) for MCAP to manage Wingsail's investments in Atler ("MCAP Agreement"). By the end of March 2019, Wingsail had invested more than $730,000 into Alter through Polsky. In late 2018, Polksy asked Chang to show Bai the December 23, 2018 "final version" of the Alter Operating Agreement ("Final Alter Operating Agreement") to have Wingsail invest more capital in Alter. At Polsky's direction, Chang showed Bai the Final Alter Operating Agreement and convinced her to have Wingsail invest additional funds in the Alter startup. Polsky also told Bai directly that the Final Alter Operating Agreement concerning Alter's membership interest in Alter and attendant annual distributions had been finalized, and that Wingsail should continue to invest with confidence, even providing updates regarding the status and viability of the business. Wingsail and Bai relied on Polsky's statements and assurances and the Final Alter Operating Agreement to continue investing in the startup.

14. In August 2019, Polsky informed Wingsail that an immediate additional cash infusion would be required from Plaintiffs or the business would go under and they would lose their entire investment. Polsky informed Bai that if she did not tender an additional $200,000-$300,000 by the end of August 2019, Alter would go out of business. Importantly, Polsky and SEFED (a company he 100% controls) had not invested any capital of his or its own into Alter and did not stand to lose any investment. Bai informed Polsky she would not be able to secure such large amounts so quickly and would need additional time.

15. On or about August 16, 2019, Polsky proposed that he would loan $100,000 to Wingsail so that it could loan the money to Alter immediately. Polsky would effectuate this loan through SEFED, not personally. Thus, SEFED, which Polsky had incorporated just a few months earlier, agreed to the loan in exchange for Wingsail's promises to tender

the $100,000 to Alter immediately and also to loan an additional $200,000 to Alter by August 29 (the "SEFED loan"). Polsky created a Pledge Agreement whereby Wingsail staked its entire interest in Alter as collateral, in favor of SEFED. The SEFED loan and the Pledge Agreement are collectively referred to as the SEFED Loan Agreements.

16.    Plaintiffs were concerned they could not provide so much cash so quickly (within two weeks). Polsky repeatedly assured Plaintiffs that the deadline was not a hard deadline and Plaintiffs could wire the funds after August 31 with no fear of breaching the SEFED Loan Agreements. Polsky even sent Chang a text message on August 15, 2019, confirming, "I don't want to take her equity. . . At all." Polsky claimed the Pledge Agreement was simply a safety net for him and that he had no intention to affect Plaintiffs' equity interests in Alter so long as Plaintiffs made the additional investment. Throughout 2019, Polsky confirmed several times that Plaintiffs could have extra time to make the additional $200,000 transfer, and that he would not take action to close on the Pledge Agreement.

17.    In October 2019, Plaintiffs transferred approximately $200,000 for Alter, as proposed and demanded by Polsky. Plaintiffs wired the funds directly into an account controlled by Polsky and Alter. Plaintiffs understood and believe this money would be used to repay the SEFED loan. Polsky accepted this payment on behalf of Alter and SEFED without question or comment.

18.    Relying on Polsky's false promises and believing them to be true at the time, Plaintiffs delivered a total of $931,820.00 to Polsky or accounts controlled by Polsky or Alter or other Alter entities, as follows:

| Date | Amount | Cumulative Total |
|---|---|---|
| 08/01/2018 | $     115,000.00 | $     115,000.00 |
| 11/02/2018 | $       46,000.00 | $     161,000.00 |
| 11/21/2018 | $       20,000.00 | $     181,000.00 |
| 12/13/2018 | $     256,000.00 | $     437,000.00 |

| 01/10/2019 | $ 149,880.00 | $ 586,880.00 |
| 03/01/2019 | $ 119,980.00 | $ 706,880.00 |
| 03/27/2019 | $  24,980.00 | $ 731,840.00 |
| 10/25/2019 | $ 199,980.00 | $ 931,820.00 |

19.    From and after the October 2019 additional $200,000 transfer by Wingsail (less a $20 wire transaction fee), Defendants continued to operate business as usual. Polsky and Bai had numerous communications about the Alter business, cashflow, operations, etc.—all the normal and customary subjects that are commonly discussed between an owner of a business (Bai) and contracted management (Polsky). At no time after the final, October 2019 transfer did Polsky ever assert that Alter required additional funds of any kind, much less that the company's finances were so dire that it may not stay in business. Nor did Polsky ever state after that date that additional funding was required or that Alter still needed Plaintiffs to make the second cash transfer contemplated in the SEFED Loan Documents. To the contrary, Polsky stated that business was doing well and Alter was making substantial profit.

20.    Defendants never provided Plaintiffs notice of any purported default on the SEFED loan, and never informed Plaintiffs that they had taken or would take Wingsail's interest in Alter. Nor did Defendants ever provide an opportunity to cure any alleged default. To the contrary, Polsky continued to assure Plaintiffs during that their investment in Alter was safe, even inquiring about the status of Bai's E2 visa application (which would not be available to Bai if she was no longer majority owner of Alter), upon which assurances Plaintiffs relied, to their detriment.

21.    For example, on October 8, 2020, Bai texted Polsky to ask "How is the Business?" and to get an update. Polsky could have used the occasion to inform (if he believed Plaintiffs did not already know) or confirm (if he believed Plaintiffs already knew) that Plaintiffs had purportedly defaulted on the SEFED loan and/or to inform Plaintiffs that, through SEFED, Defendants had already taken Wingsail's interest in Alter. But Polsky did not do so. Instead, he texted back to Bai that "Business is going ok," that

he was working to produce additional revenue opportunities and raise money which "will make the existing business more profitable so we can return capital to you hopefully sooner than later." Polsky also asked Bai "Do you intend to file your e2?" Bai responded one minute later and noted that she had heard from Alter's accountant that Wingsail's management role in Alter may have changed, without her knowledge or consent.

22.    Polsky again failed to inform or confirm that Plaintiffs had purportedly defaulted on the SEFED loan and that Defendants had taken Wingsail's interest in Alter. Instead, Polsky replied, within one minute of Bai's text, that "we have to do two things for you[.] Have to pay you back, and get you your E2 if you want it." Bai responded "Yes." Upon information and belief, Polsky's statement and assurance were meant to quell any suspicion of wrongdoing Bai may have had and to provide her (and, through her, Wingsail) sufficient assurances so that Plaintiffs would not investigate the matter further. Polsky's statements throughout these texts were false as he had no intention of giving Wingsail its shares back or of paying back Plaintiffs. Indeed, Defendants have done neither to this day. And Polsky could not "get" Bai her E2 visa as of October 8, 2020, which she confirmed she wanted, because Defendants had already taken for themselves Wingsail's majority ownership interest in Alter, which is a perquisite for Bai "getting" an E2 visa.

23.    As another example, on February 3, 2021, Polsky sent Bai a text assuring her that she would receive the distributions she was promised. He also assured Bai that her E2 visa benefits were safe, which meant that, to be a true statement, Wingsail had to have continued to own the 65% membership interest in Alter at that time, since continued ownership of a majority interest in a U.S. company is a requirement for a E2 visa, which Polsky knew. Specifically, Polsky texted to Bai: "I've always been committed to getting you your money back and your E2 (if you decide you want it)." At or around this time (e.g., on or before February 3, 2021), Polsky also made similar statements to Chang via telephone to assure Chang that his and Wingsail's interests were safe and secure, as Polsky had initially promised when the securing the seed capital back in 2018. Polsky's statements were false, however, as he had no intention of giving Wingsail its shares, instead having

already taken steps to keep the Alter membership interest for himself. And Bai's E2 visa benefits were no longer safe at that time because Polsky and SEFED had already taken steps to take for themselves Wingsail's majority ownership interest in Alter.

24.    As late as August 31, 2021, Polsky emailed Chang promising that the Alter membership would be formally assigned and transferred to Wingsail, as promised. Soon thereafter, Polksy and Chang spoke on the phone about this issue, and Polksy told Chang to assure Plaintiffs that their ownership interest in Alter was protected, which Chang did at Polsky's direction, and on which Plaintiffs relied. Polsky's statements were false, however, as he had no intention of giving Wingsail its shares, instead having already taken steps to keep the Alter membership interest for himself.

25.    Unbeknownst to Plaintiffs, Polsky had already—on paper at least— transferred to himself and SEFED the Alter equity by virtue of a document entitled "Agreement to Accept Collateral In Full Satisfaction of Obligations," which Polsky created and asked Chang to sign on behalf of Wingsail ("Acknowledgment Document"). The Acknowledgment Document was purportedly signed on April 6, 2020, but backdated to be "effective December 31, 2019."  On information and belief, Chang was not aware of the effect of the Acknowledgement Document and merely relied upon his business partner's representations that his signature was needed.

26.    Defendants have claimed the additional $200,000 transfer was used to repay a prior short-term loan, procured by Polsky, that Wingsail took out with a Jordan Mallin in or around April 2019 for $150,000. On information and belief, Mallin is a close personal friend of Polsky. Plaintiffs are unaware whether the Mallin loan was ever actually provided to Alter, much less whether the Mallin loan was ever actually repaid.

27.    By October 31, 2021, the Alter startup had become tremendously successful, as it was projected to be worth over $45 Million by the end of 2023, and over $65 Million by the end of 2026.

28.    Due in large part to being unable to prove her ownership interest in Alter, Bai has lost the ability to apply for an E2 visa through her ownership in Alter, which was the

entire purpose for Bai of investing in Alter through MCAP. Further, Plaintiffs have never received any interest or return of their capital. On information and belief, Alter has retained all the approximately $931,820.00 invested, as well as accrued profit, interest, distribution, retained earnings, and other valuable property interest in Alter, including by creating a variety of corporate entities and financial structures designed to obscure and hide the Alter assets invested in by Bai.

## V.    DISCOVERY RULE & FRAUDULENT CONCEALMENT

29.    As part of his scheme to take for himself the entire Alter investment made by Plaintiffs, Polsky, and through him, SEFED, actively misled, made material misrepresentations to, and concealed material information from Bai, Chang, and Wingsail. Defendants' misrepresentations and concealment led Plaintiffs to proceed under the false impression that Wingsail's membership interest in Alter and distributions owed by Alter were secure, and led Bai to proceed under the false impression that because of and through her majority interest in Alter, she retained the ability to apply for an E2 visa. It was not until October 2020 that Bai first suspected that Wingsail's management role in Alter may have changed, without her knowledge or consent. Even then, though, when Polsky communicated with Bai about the business, he failed to inform Plaintiffs that Defendants had already taken for themselves Wingsail's majority ownership interest in Alter. Instead, within one minute of Bai informing him that she had heard from Alter's accountant that Wingsail's management role may have changed (without Plaintiffs' knowledge or consent), Polsky responded: "we have to do two things for you[.] Have to pay you back, and get you your E2 if you want it." As such, Polsky continued to perpetuate Defendants' misconduct through further and new misrepresentations with the intent that Plaintiffs would not investigate his misconduct. Polsky's misrepresentations and false assurances continued in 2021, through other statements he made to Bai and Chang, as detailed above. Therefore, Plaintiffs could not have learned of Defendants' misconduct during this time because Polsky had actively concealed it as part of his scheme. Even if Bai suspected that something was amiss regarding her investment in Alter in October 2020, Plaintiffs'

reasonable diligence could not confirm this suspicion because Polsky, in violation of his duties and the law, continued to hide the true nature of his conduct, taking advantage of his position of trust with Plaintiffs by assuring Plaintiffs that he would deliver on the original bargain, though he knew such was neither required or possible after Defendants took Wingsail's membership interest in Alter. Polsky's ongoing failures to be candid and loyal undermined Plaintiffs' ability to learn the truth. Plaintiffs did not discover and could not have discovered through the exercise of reasonable diligence the true nature and full scope of Defendants' misconduct until December 2022 at the earliest, thereby tolling any otherwise applicable statute of limitations.

30.    Defendants were under a continuous duty to disclose to Plaintiffs the true character, quality, and nature of their tortious acts against Plaintiffs.

## VI.    RELATION TO PRIOR CLAIMS

31.    Plaintiff Wingsail initially pursued crossclaims through Chang, filed on September 29, 2023, in the matter of *Polsky v. Chang, et al.*, Case No. 8:23-CV-00225-CJC-ADS(x) (the "Chang Action"). But based upon certain technical objections raised by the counter- and cross-defendants in that case (Defendants in this case) in a motion to dismiss, Wingsail pursued its own claims in this Action here (now also with its owner, Bai, as a plaintiff) which overcomes those technical objections and is related to and relates back to the Chang Action.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### Breach of Fiduciary Duty

### (By Plaintiffs Against Polsky)

32.    Plaintiffs reallege and incorporate by reference herein each and every material allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

33.    By virtue of his position as President of MCAP, Polsky owed Plaintiffs fiduciary duties, including duties of care, loyalty, good faith, prudence, and disclosure, all

of which required Polsky to act in the best interests of Plaintiffs rather than his own, and to disclose to Plaintiffs if/when he was not doing so. Polsky breached these duties.

34.    Although Polsky was effectively acting in his own best interests and those of SEFED, which he 100% controls, Plaintiffs made their investments through MCAP, and Plaintiffs reasonably understood Polsky owed Plaintiffs a fiduciary obligation in relation to the investments they made into Alter. The genesis of Plaintiffs' relationship was through engaging with and contracting with MCAP, and the overarching purpose of that relationship was to assist Bai to obtain an E2 visa, which required her to be and remain a majority investor in a business.

35.    Polsky presented the SEFED Loan Agreements by telling Plaintiffs that they might lose their entire investment (over $730,000 at that time) if they did not invest further, and offering to provide a short-term bridge loan on behalf of his own company, SEFED. Plaintiffs understood, believed, and relied on Polsky's fiduciary obligations that Polsky was acting in their best interests when he created the SEFED Loan Agreements and, critically, in relation to the Pledge Agreement.

36.    Through the MCAP Agreement, Polsky had a contractual and fiduciary duty to "Maintain the assets and businesses of [Wingsail] in good standing, order and operating condition" and not to subject them to onerous obligations to a company he wholly controls—i.e., SEFED and the SEFED Loan Agreements.

37.    Polsky breached his fiduciary duties to Plaintiffs by structuring the SEFED loan agreement in a manner that would not protect their interests, but instead would benefit him personally. He repeatedly assured Plaintiffs that he had no interest in executing on the Pledge Agreement, and throughout the time period after Plaintiffs made the additional $200,000 investment in October 2019, Polsky interacted with Plaintiffs repeatedly without ever calling out any alleged breach by Wingsail of the SEFED Loan Agreements or his intention to take Plaintiffs' equity in Alter. At the very least, Polsky's dual (or even tripart) role in the transaction in and of itself was a conflict of interest and improper self-dealing, which constituted a breach of fiduciary duty.

38.     As a result of Polsky's breach of fiduciary obligations, Plaintiffs lost their equity interests in Alter, which has grown to a substantial business worth millions of dollars.

39.     Polsky's conduct in breach of various fiduciary duties was a direct and proximate cause of the harm suffered by Plaintiffs, in an amount to be proven at trial, currently believed to be an amount in excess of $30.5 million based on Plaintiffs' 65% interest in Alter. Further, Bai lost the ability to pursue a E2 visa application through the Alter business because she was no longer an "owner" of the business, let along the majority owner, after Defendants usurped Wingsail's ownership interest for themselves. Defendants took that away, which was Plaintiffs' entire purpose of engaging with MCAP and making the almost $1 Million investment.

40.     Defendants undertook the aforesaid acts intentionally and with conscious disregard of the rights of Plaintiffs, and did so with fraud, oppression, and/or malice, as detailed herein, so as to justify an award of punitive damages in an amount sufficient to deter such wrongful conduct in the future. Therefore, Plaintiffs are also entitled to punitive damages against Defendants in an amount to be determined at trial.

41.     As a result of Defendants' conduct as alleged herein, Plaintiffs are entitled to attorneys' fees, costs, and interest.

## SECOND CLAIM FOR RELIEF

### Constructive Fraud (Cal. Civ. Code § 1573)

### (By Plaintiffs Against All Defendants)

42.     Plaintiffs reallege and incorporate by reference herein each and every material allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

43.     Polsky owed Plaintiffs a fiduciary duty as alleged above. In addition, by virtue of Polsky's position as President of MCAP and having been introduced to Polsky by Chang as part of MCAP's effort to assist Bai to obtain an E2 visa, Polsky and Bai were in effect in a confidential relationship.

44.     Under California law, "constructive fraud" is any breach of duty that, without fraudulent intent, gains an advantage to the person at fault by misleading another to his prejudice.

45.     The source and genesis of the relationship between Polsky and Plaintiffs was MCAP. Polsky was neither a stranger nor an arms-length third party to the MCAP Agreement. He was the President of MCAP, which had agreed with Plaintiffs to act in their best interests. Moreover, the overarching purpose of that relationship was to assist Bai to obtain an E2 visa, which required her to be and remain a majority investor in a business.

46.     Polsky presented the SEFED Loan Agreements by telling Plaintiffs that they might lose their entire investment (over $730,000 at that time) if they did not invest further, and offering to provide a short-term bridge loan on behalf of his own company, SEFED. Plaintiffs understood, believed, and relied on Polsky's fiduciary obligations that Polsky was acting in their best interests when he created the SEFED Loan Agreements and, critically, in relation to the Pledge Agreement.

47.     Through the MCAP Agreement, Polsky had a contractual and fiduciary duty to "Maintain the assets and businesses of [Wingsail] in good standing, order and operating condition" and not to subject them to onerous obligations to a company he wholly controls—i.e., SEFED and the SEFED Loan Agreements.

48.     Polsky had an obligation to inform Plaintiffs that he was acting primarily to profit himself and not them by structuring a loan and pledge agreement that would result in Plaintiffs losing their entire investment in Alter and E2 visa benefit. Polsky also had an obligation to inform Plaintiffs that he would cause SEFED to close on the Pledge Agreement and take control of Alter.

49.     Further, even after the so-called "Acknowledgment Document" had been signed, Polsky never informed Plaintiffs that they no longer had any investment in Alter and that, as a result, Bai was not longer eligible for, and could thus not apply for, an E2 VISA. Indeed, as detailed in the factual allegations above, in October 2020 and several times in 2021 (e.g., February and August), Polsky assured Bai and Chang that Plaintiffs

would receive the distributions they were promised and that Bai's E2 visa benefits were safe. Polsky's statements were false, however, as he had no intention of giving Wingsail back its shares, instead having already taken steps to keep the Alter membership interest for himself, and Bai's E2 visa benefits were no longer safe at any time he made those misrepresentations because Polsky and SEFED had already taken steps to take for themselves Wingsail's majority ownership interest in Alter.

50. Plaintiffs understood, believed, and relied on Polsky's fiduciary obligations that Polsky was acting in their best interests when he created the SEFED Loan Agreements and, critically, in relation to the Pledge Agreement.

51. Additionally, Plaintiffs reasonably believed that tendering the additional funds in October 2019 would effectively pay SEFED and Polsky back for their loan. Polsky never informed Plaintiffs to the contrary, even though Polsky and Bai discussed the business multiple times over multiple years after the SEFED Loan Agreements were signed (e.g., in October 2020 and February 2021). Instead, Polsky's interactions with Plaintiffs after the SEFED Loan Agreements were signed were as if, and reasonably led Plaintiffs to believe that, Wingsail still owned 65% of Alter. Indeed, Polsky continued to assure Plaintiffs that their investment was safe and that Polsky needed to and would pay Plaintiffs back.

52. Defendants now claim that the October 2019 transfer of $200,000 was actually used to pay off an earlier, purported loan to Polsky's close personal friend, Mallin, when it could have instead been used to pay SEFED (and Polsky) back, if indeed such a loan with Mallin existed. Polsky alone determined how to use the additional $200,000 cash infusion Plaintiffs made in October 2019, to his benefit and Plaintiffs' detriment.

53. In stating to Chang (who was manager of Wingsail) that he (Polsky) would not "take her equity . . . At all" and other assurances detailed above, Polsky intended to cause Wingsail and Bai to believe SEFED would not close on the pledge agreement, or at minimum that Polsky would provide some notification that he and SEFED would do so.

54. As a result of Defendants' conduct, Plaintiffs lost their equity interests in

Alter, which has grown to a substantial business worth millions, in an amount to be proven at trial, currently believed to be an amount in excess of $30.5 million based on Plaintiffs' 65% interest in Alter. Further, Bai lost the ability to pursue a E2 visa application through the Alter business because she was no longer an "owner" of the business, let along the majority owner. Polsky and SEFED took that away, which was the entire purpose of engaging with MCAP and making the almost $1 Million investment.

55.    Defendants' conduct resulting in constructive fraud were a direct and proximate cause of the harm suffered by Plaintiffs.

56.    Defendants undertook the aforesaid acts intentionally and with conscious disregard of the rights of Plaintiffs, and did so with fraud, oppression, and/or malice, as detailed herein, so as to justify an award of punitive damages in an amount sufficient to deter such wrongful conduct in the future. Therefore, Plaintiffs are also entitled to punitive damages against Defendants in an amount to be determined at trial.

57.    As a result of Defendants' conduct as alleged herein, Plaintiffs are entitled to attorneys' fees, costs, and interest.

### THIRD CLAIM FOR RELIEF

**Fraud (Cal. Civ. Code § 1710)**

**(By Plaintiffs Against All Defendants)**

58.    Plaintiffs reallege and incorporate by reference herein each and every material allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

59.    Defendants engaged in fraud under California law, specifically Cal. Civ. Code §§ 1572 and 1710, by and through their statements and conduct, as detailed above. Specifically, Polsky repeatedly stated that the repayment obligation in the SEFED Loan Agreements would not be enforced and that Defendants would not "take her equity . . . At all," meaning Wingsail and Bai's interests in Alter. Polsky made such statements on behalf of, at minimum, SEFED, a corporation Polsky owns and wholly controls, but also for his own purposes given that only Polsky stood to benefit from the taking. Contrary to his

statements, Polsky in fact did intend to execute on the collateral Pledge Agreement as part of a broader scheme to take for himself the entire Alter investment made by Plaintiffs.

60.    Wingsail and Bai, collectively and independently, reasonably relied upon Polsky's statements and promises, including due to his role as President of MCAP, which was managing Wingsail's investments. Wingsail and Bai had already provided $200,000 in performance of the SEFED Loan Agreements, and reasonably relied on and believed based on Polsky's statements and assurances, including to Bai directly, that everything was going well with the investments, that there was no pressing need to repay the note to SEFED. Indeed, Plaintiffs believed their $200,000 cash infusion into Alter in October 2019 would be used to repay the SEFED loan itself, and were unaware that the money was purportedly used to pay off an earlier loan to Polsky's close personal friend, Mallin, instead (if indeed such a loan with Mallin existed) rather than being used to pay SEFED (and Polsky) back. Polsky alone determined how to use the additional $200,000 cash infusion Plaintiffs made in October 2019, to his benefit and Plaintiffs' detriment.

61.    Polsky's taking of Wingsail's Alter interests was the direct result of reliance on Polsky's statements and position as President of MCAP. Plaintiffs were not informed, and were not aware, that Polsky was instead secretly acting in the best interests of his own company (and therefore himself, ultimately).

62.    Plaintiffs' loss of the Alter interests has directly and proximately caused substantial harm, given the business is estimated to be worth approximately $45 million.

63.    As a result of Defendants' conduct, Plaintiffs lost their equity interests in Alter, which has grown to a substantial business worth millions, in an amount to be proven at trial, currently believed to be an amount in excess of $30.5 million based on Plaintiffs' 65% interest in Alter. Further, Bai lost the ability to pursue a E2 visa application through the Alter business because she was no longer an "owner" of the business, let along the majority owner. Polsky and SEFED took that away, which was the entire purpose of engaging with MCAP and the almost $1 Million investment.

64.    Defendants' actions and statements constitute intentional fraud (Cal. Civ.

Code § 1710(1)), fraudulent concealment (§ 1710(2)), and false promise (§ 1710(3)). Defendants' actions were not accidental, incidental, or otherwise unintended.

65.     Defendants undertook the aforesaid acts intentionally and with conscious disregard of the rights of Plaintiffs, and did so with fraud, oppression, and/or malice, as detailed herein, so as to justify an award of punitive damages in an amount sufficient to deter such wrongful conduct in the future. Therefore, Plaintiffs are also entitled to punitive damages against Defendants in an amount to be determined at trial.

66.     As a result of Defendants' conduct as alleged herein, Plaintiffs are entitled to attorneys' fees, costs, and interest.

## FOURTH CLAIM FOR RELIEF

### Promissory Estoppel/Waiver

### (By Plaintiffs Against All Defendants)

67.     Plaintiffs reallege and incorporate by reference herein each and every material allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

68.     By making the promises and assurances outlined above, Defendants effectively agreed that they, through SEFED, would not close on Pledge Agreement or, alternatively, that there was no need to close on the Pledge Agreement, or, alternatively, that the tender of an additional $200,000 in October 2019 in response to the urgent request for additional investment had substantially resolved the urgency such that there was no need to act on the Pledge Agreement. Polsky repeatedly stated and promised that he had no intent "to take her equity . . . At all," referring to Plaintiffs. Polsky also repeatedly told Plaintiffs and Chang, multiple times over multiple years after the SEFED Loan Agreements were signed, that business was going well and money was coming in the door, thereby implying that cashflow was adequate. Indeed, on August 12, 2019, Polsky communicated to Chang that there were nearly $1 Million in account receivables coming in, suggesting everybody, including Plaintiffs and Chang, could expect significant income coming into the company soon.

69.     Polsky presented the SEFED Loan Agreements by telling Plaintiffs that they might lose their entire investment (over $730,000 at that time) if they did not invest further, and offering to provide a short-term bridge loan on behalf of his own company, SEFED. Plaintiffs understood, believed, and relied on Polsky's fiduciary obligations that Polsky was acting in their best interests when he created the SEFED Loan Agreements and, critically, in relation to the Pledge Agreement.

70.     Through the MCAP Agreement, Polsky had a contractual and fiduciary duty to "Maintain the assets and businesses of [Wingsail] in good standing, order and operating condition" and not to subject them to onerous obligations to a company he wholly controls—i.e., SEFED and the SEFED Loan Agreements.

71.     Polsky had an obligation to inform Plaintiffs that he was acting primarily to profit himself and not them by structuring a loan and pledge agreement that would result in Plaintiffs losing their entire investment in Alter and E2 visa benefit. Polsky also had an obligation to inform Plaintiffs that he would cause SEFED to close on the Pledge Agreement and take control of Alter.

72.     Further, even after the so-called "Acknowledgment Document" had been signed, Polsky never informed Plaintiffs that they no longer had any investment in Alter and that, as a result, Bai was not longer eligible for, and could thus not apply for, an E2 VISA. Indeed, as detailed in the factual allegations above, in October 2020 and several times in 2021 (e.g., February and August), Polsky assured Bai and Chang that Plaintiffs would receive the distributions they were promised and that Bai's E2 visa benefits were safe. Polsky's statements were false, however, as he had no intention of giving Wingsail back its shares, instead having already taken steps to keep the Alter membership interest for himself, and Bai's E2 visa benefits were no longer safe at any time he made those misrepresentations because Polsky and SEFED had already taken steps to take for themselves Wingsail's majority ownership interest in Alter.

73.     Plaintiffs understood, believed, and relied on Polsky's fiduciary obligations that Polsky was acting in their best interests when he created the SEFED Loan Agreements

1    and, critically, in relation to the Pledge Agreement.

2    74.    Additionally, Plaintiffs reasonably believed that tendering the additional

3    funds in October 2019 would effectively pay SEFED and Polsky back for their loan. Polsky

4    never informed Plaintiffs to the contrary, even though Polsky and Bai discussed the

5    business multiple times over multiple years after the SEFED Loan Agreements were signed

6    (e.g., in October 2020 and February 2021). Instead, Polsky's interactions with Plaintiffs

7    after the SEFED Loan Agreements were signed were as if, and reasonably led Plaintiffs to

8    believe that, Wingsail still owned 65% of Alter. Indeed, Polsky continued to assure

9    Plaintiffs that their investment was safe and that Polsky needed to and would pay Plaintiffs

10   back.

11   75.    Defendants now claim that the October 2019 transfer of $200,000 was

12   actually used to pay off an earlier, purported loan to Polsky's close personal friend, Mallin,

13   when it could have instead been used to pay SEFED (and Polsky) back, if indeed such a

14   loan with Mallin existed. Polsky alone determined how to use the additional $200,000 cash

15   infusion Plaintiffs made in October 2019, to his benefit and Plaintiffs' detriment.

16   76.    In stating to Chang (who was Manager of Wingsail) that he (Polsky) would

17   not "take her equity. . . At all" and making other assurances detailed above, Polsky intended

18   to cause Wingsail and Bai to believe Defendants would not close on the Pledge Agreement,

19   or, at minimum, that Defendants would provide some notification that they would do so.

20   77.    Promissory estoppel prevents Defendants from taking advantage of their

21   actions as set out above. As a result of Defendants' conduct, Plaintiffs lost their equity

22   interests in Alter, which has grown to a substantial business worth millions, in an amount

23   to be proven at trial, currently believed to be an amount in excess of $30.5 million based

24   on Plaintiffs' 65% interest in Alter. Further, Bai lost the ability to pursue a E2 visa

25   application through the Alter business because she was no longer an "owner" of the

26   business, let along the majority owner. Polsky and SEFED took that away, which was the

27   entire purpose of engaging with MCAP and making the almost $1 Million investment.

28   78.    As a result, Plaintiffs have been damaged in an amount to be proven at trial,

currently believed to be an amount in excess of $30.5 million based on Plaintiffs' 65% interest in Alter.

79.    Defendants undertook the aforesaid illegal acts intentionally and with conscious disregard of the rights of Plaintiffs, and did so with fraud, oppression, and/or malice, as detailed herein, so as to justify an award of punitive damages in an amount sufficient to deter such wrongful conduct in the future. Therefore, Plaintiffs are also entitled to punitive damages against Counter/Cross-Defendants in an amount to be determined at trial.

80.    As a result of Defendants' conduct as alleged herein, Plaintiffs are entitled to attorneys' fees, costs, and interest.

## FIFTH CLAIM FOR RELIEF

### Rescission and Declaratory Relief

### (By Plaintiffs Against All Defendants)

81.    Plaintiffs reallege and incorporate by reference herein each and every material allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein, in particular the allegations alleging fraud and breach of fiduciary duty by Polsky.

82.    As set out above, Defendants' actions constitute fraud. Plaintiffs are entitled to rescind each and every agreement used or that played a role in Defendants misconduct, on the ground that said contracts were procured by mistake, fraud, and/or undue influence pursuant to Cal. Civ. Code § 1689. Specifically:

   a.    The "Loan and Pledge Agreement" between SEFED and Wingsail, dated August 16, 2019;

   b.    The "Promissory Note" between SEFED and Wingsail, dated August 16, 2019; and

   c.    The "Agreement to Accept Collateral In Full Satisfaction of Obligations," dated April 6, 2020, but backdated to be "effective December 31, 2019."

83.    Accordingly, Plaintiffs seek a declaration that the agreements outlined above

are rescinded and void *ab initio*, and further that Plaintiffs are the owner of 65% interest in Alter, however currently formed or structured. Alternatively, Plaintiffs are unaware of the current state of ownership interests in Alter and, upon information and belief, allege that Alter has undertaken an expansion of corporate entities, shareholders, owners, investors, and/or equity holders of various kinds, and therefore seek a declaration of their ownership interests in Alter that were taken by Defendants.

84.     Plaintiffs are also entitled to an order permitting Plaintiffs to return the $100,000 loaned by SEFED to Wingsail, which they stand ready, willing, and able to do if and when required.

85.     As a result of Defendants' conduct as alleged herein, Plaintiffs are entitled to attorneys' fees, costs, and interest.

## SIXTH CLAIM FOR RELIEF

### Conversion

### (By Plaintiffs Against All Defendants)

86.     Plaintiffs reallege and incorporate by reference herein each and every material allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

87.     Plaintiffs had a property interest, including in the money delivered by Plaintiffs to Polsky and Alter. Through the actions detailed herein, Defendants converted that money—the specific sums set out above—for themselves, and continue to retain that money improperly. Defendants' conduct, including closing on the Pledge Agreement, effectuated a conversion of Plaintiffs' nearly $1 Million tendered to invest in Alter.

88.     To date, Defendants have not returned Plaintiffs' money, even after acknowledging their obligation to do so. Plaintiffs have been harmed by not having possession of the money identified above, and not being able to invest the money and earn a return.

89.     Further, Defendants have converted Plaintiffs' Alter interest for themselves by engaging in the fraudulent acts described above, including by refusing to give Wingsail

its 65% membership interest in Alter as represented and promised. Defendants simply stole the Alter equity, as neither Wingsail nor Bai, to this date, has received anything from their nearly $1 Million investment in Alter—no shares, no distribution, no profits, no dividends, and not even a return of Wingsail's capital or Bai's promised visa.

90.    Plaintiffs did not consent to Defendants' wrongful exercise of dominion over the property.

91.    As a direct and proximate result of Defendants' conversion, Plaintiffs have been harmed and suffered damages in an amount to be proven at trial, in an amount at minimum the money described above, but also believed to be in excess of $30.5 Million in compensatory damages based on valuation of Plaintiffs' Alter membership interests.

92.    Defendants undertook the aforesaid illegal acts intentionally and with conscious disregard of the rights of Plaintiffs, and did so with fraud, oppression, and/or malice, as detailed herein. This despicable conduct subjected Plaintiffs to cruel and unjust hardship so as to justify an award of punitive damages in an amount sufficient to deter such wrongful conduct in the future. Therefore, Plaintiffs are also entitled to punitive damages against Defendants in an amount to be determined at trial.

93.    As a result of Defendants' conduct as alleged herein, Plaintiffs are entitled to attorneys' fees, costs, and interest

## SEVENTH CLAIM FOR RELIEF

### Theft – Cal. Pen. Code § 4296(c)

### (By Plaintiffs Against All Defendants)

94.    Plaintiffs reallege and incorporate by reference herein each and every material allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

95.    Defendants have wrongfully retained possession of Plaintiffs' money and Alter equity, which they obtained through conduct that constitutes theft and conversion under Penal Code section 496.

96.    At all relevant times, Defendants knew that the money and Alter equity

belonged to Plaintiffs and that they did not have Plaintiffs' consent to use or retain the property. Defendants nonetheless have refused to return the money and Alter equity, despite Defendants' promises and commitments to do so, and Plaintiffs' demands. Defendants therefore have wrongfully obtained property that Defendants know to have been stolen as used in section 496.

97.    As result of their conduct, Plaintiffs have been denied use of the property and have been damaged in an amount to be proven at trial.

98.    Pursuant to Penal Code section 496(c), Plaintiffs are entitled to recover three times the amount their actual damages—in this case, three times at minimum the value of the money Plaintiffs delivered to Polsky plus the current value of the Alter equity—and an award of reasonable attorneys' fees, costs, and interest.

## EIGHTH CLAIM FOR RELIEF

### Restoration of Property Pursuant to Cal. Civ. Code § 1712

### (By Bai Against All Defendants)

99.    Plaintiffs reallege and incorporate by reference herein each and every material allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

100.    Defendants have wrongfully retained possession of Plaintiffs' money and Alter equity, without Plaintiffs' consent or consent by Plaintiffs that was effectively rescinded upon Defendants' actions to take the Alter equity by closing on the Pledge Agreement.

101.    As direct result Defendants' conduct, Plaintiffs have been denied use of their property and are entitled to restoration of that property, the return of the money detailed above, and compensation for the loss of their use during the time period the property was wrongfully withheld by Defendants.

102.    Defendants undertook the aforesaid acts intentionally and with conscious disregard of the rights of Plaintiffs, and did so with fraud, oppression, and/or malice, as detailed herein, so as to justify an award of punitive damages in an amount sufficient to

deter such wrongful conduct in the future. Therefore, Plaintiffs are also entitled to punitive damages against Defendants in an amount to be determined at trial.

103. As a result of Defendants' conduct as alleged herein, Plaintiffs are entitled to attorneys' fees, costs, and interest.

## NINTH CLAIM FOR RELIEF

### Unjust Enrichment/ Constructive Trust

### (By Plaintiffs Against All Defendants)

104. Plaintiffs reallege and incorporate by reference herein each and every material allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

105. Based on the allegations above, Plaintiffs have lost the financial benefit of the investment money tendered to Defendants, as well as the economic value of being 65% owner of Alter.

106. Defendants have been unjustly enriched by their wrongful actions, including breach of fiduciary duties, fraud, theft, conversion, and UCL violations.

107. Defendants must be declared by this Court to be the involuntary trustees of a constructive trust of all the property wrongfully taken by Defendants.

108. As a result of Defendants' conduct as alleged herein, Plaintiffs are entitled to costs and interest.

## TENTH CLAIM FOR RELIEF

### Accounting

### (By Plaintiffs Against All Defendants)

109. Plaintiffs reallege and incorporate by reference herein each and every material allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

110. Polsky owed Plaintiffs fiduciary obligations as detailed above. In breach of said fiduciary duties, among other tortious conduct, Polsky used SEFED to wrongfully deprive Plaintiffs of the value of their investment in Alter as detailed above, making

SEFED the owner "on paper" of Plaintiffs' interests in Alter, and refusing to recognize Plaintiff's interests or return the money that Plaintiffs had delivered to Polsky to invest in Alter.

111.   Upon information and belief, SEFED and Polsky, both individually and in his various capacities as an officer, member, and/or owner of SEFED and Alter, orchestrated a deliberate and complex scheme involving the creation and manipulation of multiple limited liability companies and corporate entities designed to obscure and convolute the true ownership and financial status of Alter, thereby making it exceedingly difficult for Plaintiffs and other interested parties to understand the actual equity and management structures. Upon information and belief, said entities include, but are not limited to, Alter Management LLC, Alter Health Group, Inc., Alter Life Sciences, Inc., Alter Life Sciences, LLC, Cambridge Mental Health Management, LLC, Alter Addiction Treatment LLC, Altignis Health LLC, Altignis Campus LLC, California Rehab Campus LLC, Alter Mental Health LLC, Alter Behavioral Health, Alter Behavioral Health—Capistrano Beach, LLC, Alter Mental Heath—Capo Beach, LLC, Alter Mental Health—Dana Point, Dana Point Rehab Campus, LLC, and others unknown currently to Plaintiffs and likely to be identified through discovery. Upon information and belief, Defendants and other individuals and entities have participated in creating the complex financial and corporate structures, including incurring debt and hypothecating and encumbering the property.

112.   This complex web of entities was created and manipulated by Polsky with the clear intent to hinder, delay, and prevent the discovery by Plaintiffs of his fraudulent activities and breaches of fiduciary duties. By muddying the ownership records and financial dealings of Alter, Polsky sought to complicate any potential legal or financial audits, investigations, or inquiries that might reveal his unauthorized and illicit activities.

113.   As a direct and proximate result of Defendants' fraudulent concealment and intentional complexity, Plaintiffs suffered significant financial losses and were deprived of their rightful ownership interests and returns on investment. Defendants' conduct constitute a clear breach of Polsky's fiduciary duties owed to Plaintiffs, involving acts of

fraud, misrepresentation, and deception that were aimed at personal enrichment at the expense of Plaintiffs and to the detriment of their investments in Alter.

114. Under California law, Plaintiffs are entitled to an accounting based on the fiduciary relationships implied and manifested by the business dealings and the complex structure created by Polsky, as well as his direct and indirect management of the invested funds and the entities involved. Plaintiffs have a right to, and in good faith demand, a full accounting from Defendants, including of SEFED since it now holds Plaintiffs' interest in Alter, to ascertain the true financial status of their investments, which are under the direct or indirect control or influence of Polsky and/or the corporations he owns and controls, including SEFED.

115. Despite demands, Defendants have failed and refused, and continue to fail and refuse, to provide Plaintiffs with such an accounting, thereby necessitating this action.

116. Plaintiffs seek an order from this Court for a complete and thorough accounting of all the financial transactions relevant to their investments in Alter and any other entity controlled or influenced by Defendants related in any manner to Alter, to determine the extent of the funds misappropriated or mismanaged and to facilitate the proper recovery and restitution of these funds.

117. As a result of Defendants' conduct as alleged herein, Plaintiffs are entitled to attorneys' fees, costs, and interest.

## ELEVENTH CLAIM FOR RELIEF

### Unfair, Unlawful, and Fraudulent Business Practices

### (Cal. Bus. & Prof. Code § 17200 et seq.)

### (By Plaintiffs Against All Defendants)

118. Plaintiffs reallege and incorporate by reference herein each and every material allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

119. Business and Professions Code section 17200 *et seq.* (the Unfair Competition Law, or "UCL") prohibits any unlawful, unfair, or fraudulent business act or practice.

120.    Defendants violated the UCL by engaging in the business acts and practices identified in detail above.

121.    As a result of the acts and practices detailed herein, Plaintiffs have incurred an actual injury and been deprived of the money and property identified in this Complaint. To this date, Defendants continue to maintain possession and control of Plaintiffs' property, to the exclusion of Plaintiffs.

122.    Plaintiffs have a right under the UCL to have such money and property restored and to disgorge any and all profits obtained by Defendants through their act and practices in violation of the UCL.

123.    Unless Defendants are enjoined from continuing to engage in the unlawful, unfair, and/or deceptive business practices outlined herein, Plaintiffs will continue to be injured by Defendants' actions.

124.    Plaintiffs seek injunctive relief and restitution for Defendants' violations of the UCL.

125.    As a result of Defendants' conduct as alleged herein, Plaintiffs are entitled to attorneys' fees, costs, and interest.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs prays that the Court grant judgment against Defendants as follows:

1.    Compensatory damages in an amount according to proof at trial;

2.    Disgorgement of assets according to proof;

3.    Costs, restitution, and multiple damages;

4.    Punitive and exemplary damages;

5.    Any and all applicable statutory and civil penalties;

6.    Restitution in an amount according to proof at trial;

7.    Rescission of the following agreements:

a.    The "Loan and Pledge Agreement" between SEFED and Wingsail, dated August 16, 2019;

b.   The "Promissory Note" between SEFED and Wingsail, dated August 16, 2019; and

c.   The "Agreement to Accept Collateral In Full Satisfaction of Obligations," dated April 6, 2020, but backdated to be "effective December 31, 2019";

8.   Preliminary Relief ordering an Accounting of Alter's books and records to determine Plaintiffs' ownership.

9.   A declaration as requested above;

10.  An order enjoining Defendants from dissipation of assets and fraudulent transfer to avoid judgment;

11.  Pre- and post-judgment interest on all amounts awarded;

12.  Attorneys' fees and costs;

13.  Any further relief this Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all triable issues.

Date: January 13, 2025                      SHEIK LAW, INC.

                              By:      /s/ Mani Sheik
                                   Mani Sheik, Esq.

                                   Attorneys for Plaintiffs Wingsail Holdings, LLC and Yunfei "Kristy" Bai