EXHIBIT A

**EXHIBIT**

5

## LOAN AND SECURITY AGREEMENT

This Loan and Security Agreement (this "**Agreement**") is entered into and effective as of <u>04/10/2019</u> (the "**Effective Date**"), by and between Jordan Mallin, a California resident ("**Lender**"), and Wingsail Holdings, LLC, a Washington limited liability company ("**Borrower**"), with reference to and in reliance upon the following facts:

### RECITALS

A. In order to fund operations of Alter Management, LLC, of which the Borrower is an equity holder and financier, the Borrower desires to borrow funds and obtain other financial accommodations from Lender.

B. Lender is willing to provide financing and provide other financial accommodations to Borrower upon the terms and conditions set forth herein and in the other documents executed and delivered in connection herewith.

NOW, THEREFORE, in consideration of the terms and conditions contained in this Agreement, and of any extensions of credit made or to be made to or for the benefit of Borrower by Lender, the parties, therefore, agree as follows:

## 1. **DEFINITIONS.**

1.1 "**Account Debtor**" means any person or entity who is or may become obligated upon a receivable.

1.2 "**Accounts**" means all amounts due and to become due to Borrower and other accounts, contract rights, chattel paper, instruments and documents, whether now owned or to be acquired by Borrower.

1.3 "**Agreement**" has the meaning specified in the preamble to this Agreement.

1.4 "**Business Day**" means any day on which Lender is open for business with the general public, other than Saturday or Sunday.

1.5 "**Collateral**" means:

a) All accounts, accounts receivable, contract rights, and general intangibles, including, without limitation, all forms of payment, all present and future incomes, rents, revenues, issues and profits, goodwill, licenses and license rights, bailment or leasehold interests, whether as lessor or lessee, all cases in action and recoveries for any loss in value of the real estate of Borrower or items of property described in this Agreement (without limitation including the real property related to or incident to the Wingsail Holdings, LLC, revenue related to or incident to Wingsail Holdings, LLC, and revenue related to or incident to Wingsail Holdings, LLC, or any successors thereto), rights in and to security agreements and other contracts or assignments providing security to Borrower, book debts, credits, indemnities, warranties or guarantees payable to Borrower on loss or damage of property, inventions, designs, design registrations, trademarks, trade styles, trade names, know-how, powers, privileges, logos, franchise rights, payments in kind, advertising and promotional materials, trade secrets, patents, patent rights, copyrights, patent applications, tax refunds, customer lists, business and accounting records, including all ledger account cards, computer

tapes and disks, and other computer information, in all cases whether now owned or hereafter created or acquired by Borrower or in which Borrower may now have or may after the Effective Date acquire an interest;

b) All inventory, including, without limitation, all goods held for sale or lease, finished goods, merchandise, parts, and supplies, of every kind and description, whether now owned or acquired by Borrower after the Effective Date, or in which Borrower may now have or may after the Effective Date acquire an interest, including, without limitation, inventory temporarily out of Borrower's custody or possession and any returns or repossessions on any sales or accounts;

c) All goods, including, without limitation, equipment, machinery, materials, furniture, furnishings, engines, appliances, fixtures, tools, parts, supplies, and vehicles of every kind and description, whether now owned or acquired by Borrower after the Effective Date or delivered to the real property of Borrower, or in which Borrower may now have or may after the Effective Date acquire an interest, and all additions, accessions, replacements, substitutions, and improvements to such goods and wherever located;

d) All documents, documents of title, deposit accounts, negotiable and non-negotiable instruments, shares, stocks, bonds, debentures, securities, moneys, sources of money, uncalled capital, letters of credit, investment property, and chattel paper whether now owned or acquired after the Effective Date by Borrower;

e) All fee interests and leasehold estates in real property now or hereafter owned or leased by Borrower and such documentation and opinions in connection with the grant of such lien as Lender shall request, including title insurance policies, financing statements, fixture filings and environmental audits, and Borrower shall pay all recording costs, intangible taxes and other fees and costs (including reasonable attorneys fees and expenses) incurred in connection therewith; and

f) All proceeds and products of any of the personal and real property described above, in any form, including, without limitation, proceeds of any insurance relating to such collateral or fire and builder's risk insurance and unrenewed insurance premiums, proceeds consisting of any of the above types of collateral, all awards made in eminent domain proceeds or purchased in lieu of such eminent domain proceeding; proceeds of any non-commercial tort cause of action in existence, now or after the Effective Date, and all replacements, substitutions, renewals, returns, additions, accessions, rents, royalties, issues, documents of ownership, and receipts for any of the foregoing.

1.6    *"Commitment"* means that certain text messages constituting an agreement between Lender and Borrower dated between 4/5/19 and 4/7/19.

1.7    *"Costs"* has the meaning specified in Section 2.9

1.8    *"Default Rate"* has the meaning specified in Section 7.2.

1.9    *"Disbursements"* has the meaning specified in Section 2.1, and for purposes measuring any time period a Disbursement shall be deemed to have occurred on the day Lender pays it.

1.10   "*Effective Date*" has the meaning specified in the preamble to this Agreement.

1.11   "*Event of Default*" means any event listed in Section 7.1 of this Agreement.

1.12   "*Final Disbursement Date*" means the date that the final Disbursement of the Loan is made to Borrower, which shall be no later than the first anniversary of the Initial Disbursement Date.

1.13   [*left blank*]

1.14   "*Funds Release Payment*" has the meaning set forth in Section 2.9(d).

1.15   "*Initial Disbursement Date*" means the date on which Lender makes the first Disbursement of the Loan to Borrower.

1.16   "*Intercreditor and Subordination Agreement*" means any Intercreditor and Subordination Agreement required by the Senior Lender to be entered into between Lender and Senior Lender as a condition to the Senior Loan.

1.17   "*Lender*" has the meaning specified in the preamble to this Agreement.

1.18   [*left blank*]

1.19   [*left blank*]

1.20   "*Loan*" has the meaning specified in Section 2.1.

1.21   "*Loan Documents*" means this Agreement, the Notes, and any other agreement, instrument, and other document executed and delivered pursuant hereto or thereto or otherwise evidencing or securing the Loan or any other Obligation.

1.22   "*Material Adverse Effect*" means a material adverse effect on (i) the business, assets, operations, or condition (financial or otherwise) of Borrower or (ii) the ability of Borrower to pay any of the Obligations when due and perform its obligations under this Agreement or (iii) the ability of Lender to enforce any of its rights or to collect any of the Obligations then due and payable.

1.23   "*Notes*" means one or more Secured Promissory Notes, substantially in the form attached hereto as Exhibit A, to be issued by Borrower upon Lender's making of each Disbursement hereunder.

1.24   "*Obligations*" means all present and future indebtedness, obligations, and liabilities of Borrower to Lender under this Agreement, the Notes, and the other Loan Documents, whether or not the right of payment in respect of such claim is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, disputed, undisputed, legal, equitable, secured, unsecured, and whether or not such claim is discharged, stayed or otherwise affected by any proceeding.  Without limiting the generality of the foregoing, the Obligations of Borrower under the Loan Documents include (a) the obligation (irrespective of whether a claim therefor is allowed in any insolvency proceeding) to pay principal, interest, charges, expenses, fees, attorneys fees and disbursements, indemnities and other amounts payable by Borrower under the Loan Documents, and (b) the obligation of such Person to reimburse any amount in respect of any of the foregoing that Lender (in its sole discretion) may elect to pay or advance on behalf of Borrower.

1.25   "*Permitted Indebtedness*" means the Senior Loan and any loan to Borrower by a third party for the purposes of funding any costs related to the Project.

1.26   "*Permitted Lien*" means a mortgage, deed of trust, pledge, hypothecation, assignment, charge, deposit arrangement, encumbrance, easement, lien (statutory or other), security interest, or other security arrangement and any other preference, priority, or preferential arrangement of any kind or nature whatsoever, encumbering the Collateral to secure any Permitted Indebtedness, provided that, except as to the Senior Loan, the interest of any person in any such Permitted Lien shall be expressly subordinated to the security interest granted pursuant to Section 3.1 of this Agreement.

1.27   "*Person*" means any individual or entity, including, but not limited to, corporations, partnerships, limited liability companies, limited partnerships etc.

1.28   "*Prepayment Penalty*" has the meaning specified in Section 2.7.

1.29   "*Project*" has the meaning specified in Section 2.3.

1.30   "*Termination Date*" has the meaning specified in Section 2.5.

1.31   [*left blank*]

All computations required under this Agreement shall, unless otherwise specified, be made in accordance with U.S. generally accepted accounting principles ("GAAP") and practices consistently applied. Accounting terms used herein not otherwise defined shall have the meanings attributable thereto under generally accepted accounting principles, and practices.

## 2. LOAN.

2.1 Subject to the terms and conditions hereof, Lender hereby agrees to make a loan in an aggregate principal amount of One Hundred Fifty Thousand Dollars ($150,000) (the "*Loan*") to Borrower, which shall be disbursed to Borrower, by check or wire transfer in immediately available funds in one (1) or more disbursements of One Hundred Fifty Thousand Dollars ($150,000) (a "*Disbursement*"

2.2 The outstanding unpaid principal balance and all accrued and unpaid interest under the Loan shall be due and payable as set forth in this Agreement or the Notes, but in no event later than the Termination Date.  All amounts outstanding under the Loan shall constitute Obligations.  Payment of all Obligations shall be made to Lender or its designee by check or wire transfer in immediately available funds.

2.3 The Loan proceeds will be used by Borrower to fund the operations of Alter Management, LLC (the "*Project*").

2.4 Except as provided in Section 7.2 below, commencing on the first Disbursement Date, all Obligations shall accrue simple interest at a per annum rate equal to Thirty Percent (30.00%) computed on the basis of a 365-day year for the actual number of days elapsed, on the unpaid principal amount of the Obligations, accruing until all interest and principal has been paid.  Accrued interest on the outstanding unpaid principal amount of the Obligations shall be payable upon payoff.

On the Termination Date, all outstanding principal and any accrued and unpaid interest hereunder shall be paid in full.

2.5 The term of this Agreement will expire after 60 days, unless extended pursuant to Section 2.6. The "**Termination Date**" shall be the later of such sixty days or the end of the Extension Term as defined in Section 2.6. All outstanding Obligations will become due and payable in full on the Termination Date.

2.6 The term of this Agreement may be extended for a period of four one-week terms (each such period an "**Extension Term**") at the sole and exclusive discretion of Lender pursuant to a request by Borrower at least 7 days prior to the then effective Termination Date. In no event shall Extension Terms continue the term of the Loan beyond four weeks of the Initial Disbursement Date.

2.7 The Loan may be prepaid however, all interest is fully earned.

2.8 [*left blank*]

2.9 [*left blank*]

2.10 Borrower will pay to Lender without limitation reasonable attorneys' fees, other professionals' fees, court costs, litigation and other expenses and wire transfer and bank fees (collectively, "**Costs**"), incurred or paid by Lender in connection with the enforcement of this Agreement or any of the other Loan Agreements, and the defense, preservation and protection of Lender's rights and remedies thereunder, including without limitation, its security interest in the Collateral or any other property pledged to secure the Loans hereunder, whether incurred in bankruptcy, insolvency, foreclosure or other litigation or proceedings or otherwise. The Costs will be due and payable within ten (10) Business Days of Lender's submission to Borrower of a reasonable accounting of such costs. If Borrower fails to pay any Costs in a timely manner, Lender is entitled to disburse such sums as a Loan under this Agreement, and for such purpose, the maximum amount of the Loan shall be increased by the amount of such Costs. Thereafter, the Costs will bear interest from the date incurred or disbursed at the Default Rate. This provision will survive the termination of this Agreement and the repayment of any amounts due or the performance of any obligation under this Agreement. Borrower shall pay Costs out of revenue from operations only, and shall not use any Loan proceeds to pay Costs.

## 3. SECURITY INTEREST/COLLATERAL

3.1 As security for the Obligations, Borrower hereby grants Lender a first priority security interest in the equity shares of Alter Management LLC and all revenues and profits of the Borrower.

3.2 Notwithstanding any termination, until all of the Obligations shall have been fully paid and satisfied, Lender shall be entitled to retain its security interest in the Collateral; and Lender shall retain all of its rights and remedies under this Agreement.

3.3 Upon payment in full of the Obligations, Lender shall release its security interest in the Collateral, and this Agreement shall terminate and be of no further force and effect, except for Sections 2.9, 8.4 and 8.5, which shall survive the termination hereof.

4. CONDITIONS PRECEDENT.  Lender's obligations hereunder are subject to the prior satisfaction of the following conditions:

4.1 There shall not have occurred any material adverse change with respect to the condition, financial or otherwise, business, results of operations, assets, or liabilities of Borrower, individually and taken as a whole, as determined by Lender in its sole discretion.

    a)   As to each Disbursement, the delivery of a Note evidencing Borrower's indebtedness therefor.

    b)   Evidence that the execution, delivery, and performance by Borrower of this Agreement, the Note or Notes applicable to each Disbursement, and the other Loan Documents, and the execution, delivery, and performance by Borrower and subordinating creditor of any instrument or agreement required under this Agreement, the Notes, or the other Loan Documents, as appropriate, have been duly authorized.

    c)   Such financing statement(s) (Form UCC-1) as Lender may require with respect to this Agreement and any of the Loan Documents.

    d)   Evidence that all security interests required to be provided in favor of Lender are valid, enforceable, and prior to the rights and interests of others, except as noted herein, and any other documents that Lender may reasonably request to reflect, perfect or protect Lender's first priority lien in the Collateral;

    e)   Certificates of insurance (and policies), as described in Section 6.5, covering the Collateral, each naming Lender as first loss payee and containing a clause requiring the insurer to give not less than thirty (30) days prior written notice to Lender in the event of cancellation of the policy for any reason whatsoever.

    f)   Opinions from Borrower's counsel (including, without limitation, local counsel) as to such matters as Lender and its counsel may reasonably request.

    g)   Evidence that that Lender has injected into the Project as equity cash in the amount of a minimum $500,000.00;

    h)   A current balance sheet of Borrower;

    i)   As to each Disbursement, Borrower shall have delivered any Funds Release Payment resulting from the increase in the aggregate principal amount of the Loan from such Disbursement; and

    j)   Such other documents and instruments as Lender may reasonably request.

5. REPRESENTATIONS AND WARRANTIES. Borrower represents and warrants that:

5.1   Borrower is duly organized and validly existing under the laws of the state of its organization and that the execution, delivery, and performance of this Agreement are within Borrower's powers, have been duly authorized, and are not in conflict with the terms of its organizational documents, each as amended through the Effective Date.

5.2   The execution, delivery, and performance of this Agreement, the Notes, the other Loan Documents, and of any instrument or agreement required by this Agreement, the Notes and/or the other Loan Documents are not in conflict with any law or any indenture, agreement, or undertaking to which Borrower is a party or by which Borrower is bound or affected.

5.3   All financial information submitted by Borrower to Lender is true and correct in all material respects and is complete insofar as may be necessary to give Lender true and accurate knowledge of the subject matter thereof. Borrower is not in default under any indenture, loan agreement, mortgage, lease, trust deed, deed of trust, material contract, or any other agreement to which it is a party or by which it is bound.

5.4   All Collateral shall be owned by Borrower, free and clear of all clouds to title and of all security interests, liens, encumbrances and rights of others except Senior Liens and the rights of Lender under this Agreement.

5.5   All information that Borrower has provided to Lender concerning the Collateral is true and correct.

5.6   There is no litigation, tax claim, proceeding or dispute pending, or, to the knowledge of Borrower, threatened, against or affecting Borrower or its property, the adverse determination of which might have a Material Adverse Effect.

5.7   Borrower is not a party to or subject to any agreement or restriction that in the opinion of Borrower's management is so unusual or burdensome that it might have a Material Adverse Effect.

5.8   Borrower's office is located at:  2033 6th Avenue, Ste 920, Seattle, Washington 98121.

5.9   Borrower has not conducted business in any other names.

5.10   No event has occurred and is continuing or would result from the making of a Loan that constitutes an Event of Default or that, upon lapse of time or notice or both, would become an Event of Default.

5.11   Borrower will use the Loan proceeds exclusively to finance the Project.

5.12   Borrower has taken no action and will take no action to impair the security interest of the Lender.

5.13   Borrower and the signatory hereto of the Borrower have adequate information and authority to make all representations, warranties and agreements contained herein.

6. COVENANTS.  Borrower covenants and agrees that until the full and final payment of the Loan and all other Obligations incurred hereunder, Borrower will do all of the following, unless Lender waives compliance in writing:

6.1 Payment.  Pay principal and interest on the Loan and all other Obligations incurred hereunder according to the terms hereof.

6.2 Notice to Lender.  Promptly give written notice to Lender of any of the following:

   a)   Any substantial dispute that may exist between Borrower and any governmental regulatory body or law enforcement authority;

b) An Event of Default or any event that, upon a lapse of time or notice or both, would become an Event of Default; and

c) Any other matter that has resulted or might result in a Material Adverse Effect.

6.3 Books and Records. Furnish to Lender upon demand any of its books and records and such other data and information (financial and otherwise) as Lender from time to time may reasonably request, bearing upon or related to Borrower's financial condition or results of its operations.

6.4 Additional Obligations. Perform, on request of Lender, such acts or execute and deliver such documents as may be necessary or advisable to perfect any liens or security interests provided for herein or otherwise to carry out the intent of this Agreement.

6.5 Insurance. On the same terms and conditions as required by Senior Lender, or if no senior lender is providing a loan to Borrower, on such terms as customary for companies of similar size and operating in the same or similar businesses or otherwise reasonably satisfactory to Lender, continuously maintain and keep in force insurance with respect to Borrower's assets in adequate amounts, including property and liability insurance and fire and hazard insurance policies, all of which will be evidenced by certificates of insurance delivered to Lender by Borrower on the Effective Date or such other date as Lender may choose in its sole discretion.

6.6 Information. Cause all information, upon submission by Borrower to Lender to be true and correct in all material respects and complete to the extent necessary to give Lender a true and accurate knowledge of the subject matter thereof.

6.7 Inspection of Collateral. Permit Lender, by its representatives and agents, to inspect the Collateral, to examine and make copies of the records of Borrower relating thereto, and to discuss the Collateral, and the records of Borrower with respect thereto with, and to be advised as to the same by Borrower's officers, all at such reasonable times and intervals as Lender may determine.

6.8 Taxes. Pay when due all taxes, assessments and governmental charges and levies upon the Collateral, except those that are being contested in good faith by appropriate proceedings.

6.9 Notification of Account Debtors. Upon the request of Lender, notify all or such of the Account Debtors as Lender shall specify to make payment thereon at such place and in such manner as Lender shall specify.

6.10 Disposition of Collateral. Not sell, lease or otherwise dispose of the Collateral except, prior to the occurrence of an Event of Default, sales of inventory in the ordinary course of business.

6.11 Change in Location or Name.

a) Not maintain its chief executive office at a location other than that specified in Section 5.8 without delivering prior written notice to Lender;

b) Not change its name without delivering prior written notice to Lender; and

c) Not change its mailing address without delivering prior written notice to Lender.

6.12 Other Indebtedness. Not create, incur, assume, suffer to exist, guarantee, or otherwise become or remain, directly or indirectly, liable with respect to any indebtedness, except for (a) the Obligations evidenced by this Agreement and the other Loan Documents, (b) other indebtedness to Lender, its

parent, subsidiaries, or any of its affiliates, (c) other indebtedness incurred in the ordinary course of business, not to exceed $50,000 in the aggregate, and (d) any Permitted Indebtedness.

6.13 Liens.  Not create, incur, assume, or suffer to exist, directly or indirectly, any lien or encumbrance on or with respect to any of its assets, of any kind, whether now owned or hereafter acquired, or any income or profits therefrom, except for any Permitted Lien.

6.14 Senior Loan Payments.  Borrower shall fully and timely pay all amounts owing under the Senior Loan Documents and timely and fully perform all of its covenants and agreements contained therein.  Borrower shall provide Lender with copies of all notices (except routine notices that would not include any notice related to any failure to comply with any terms of the Senior Loan Documents or regarding any event of default under the Senior Loan Documents) given or received by Borrower under or pursuant to the Senior Loan Documents, promptly upon delivery or receipt as the case may be.  Without limiting Lender's right to declare an Event of Default on account of a failure to comply with the terms and provisions of the Senior Loan Documents, if Borrower fails so to pay or perform such obligations, and if such failure becomes an Event of Default hereunder, Lender may pay or perform the same subject to the terms of the Intercreditor and Subordination Agreement.  Notwithstanding the foregoing, (i) Lender shall have no obligation whatsoever to pay any of the amounts evidenced or secured by, or to perform any of the covenants or obligations imposed by, any Senior Loan Documents, and (ii) any such payment by Lender shall not cure Borrower's default hereunder or under the Senior Loan Documents but shall only protect Lender's interest.  All sums so paid and the costs and expenses incurred by Lender in exercising rights under this Section (including attorneys' fees), with interest at the Default Rate for the period from the date that such costs or expenses were incurred to the date of payment to Lender, shall constitute a portion of the Indebtedness, shall be secured by the liens securing this Loan and shall be due and payable to Lender within two (2) Business Days following demand therefor. Borrower shall not impede, interfere with, hinder or delay, any effort or action on the part of Lender to cure any event of default under the Senior Loan or to otherwise protect or preserve its interests in the Loan and/or the collateral securing the Loan following a default or asserted default under the Senior Loan.

6.15 Any default or breach by Borrower under the Senior Loan Documents that is not cured prior to the expiration of any applicable grace, notice or cure period afforded to Borrower thereunder or otherwise waived by Senior Lender shall constitute an event of default under this Agreement for so long as it continues, without regard to any subsequent payment or performance of any such obligations by Lender.  Borrower hereby grants Lender and any Person designated by Lender the right to enter upon the Project, at any time following the occurrence of any default or asserted default under the Senior Loan Documents, for the purpose of taking any such action or to appear in, defend or bring any action or proceeding to protect Borrower's and/or Lender's interest.  Lender shall have no obligation to complete any cure or attempted cure undertaken or commenced by Lender.  If Senior Lender or Borrower shall deliver to Lender a copy of any notice of default under the Senior Loan

Documents sent by a Senior Lender to Borrower, such notice shall constitute full protection to Lender for any action taken or omitted to be taken by Lender, in good faith, in reliance thereon.

7. EVENTS OF DEFAULT. REMEDIES.

7.1 Default.  The occurrence of any one or more of the following events shall constitute an "*Event of Default*":

a) Borrower fails to pay any part of the Obligations on the date due and payable or declared due and payable by Lender and the same is not cured within five (5) days after Lender gives Borrower notice identifying such default;

b) Borrower fails or neglects to perform, keep or observe any other term, provision, condition or covenant contained in this Agreement, which is required to be performed, kept or observed by Borrower and the same is not cured to Lender's satisfaction within thirty (30) days after Lender gives Borrower notice identifying such default;

c) Any statement, warranty, representation, report, financial statement, or certificate made or delivered by Borrower, or any of its officers, employees or agents, to Lender is untrue or incorrect in any material respect;

d) There shall occur any material uninsured damage to or loss, theft, or destruction of any of the Collateral;

e) An Event of Default as defined in the Senior Loan Documents shall have occurred and continued beyond any applicable notice and cure periods;

f) The Collateral or any of Borrower's other assets are attached, seized, levied upon or subjected to a writ or distress warrant, or come within the possession of any receiver, trustee, custodian or assignee for the benefit of creditors and the same is not cured within thirty (30) days thereafter;

g) An application is made by any Person other than Borrower for the appointment of a receiver, trustee, or custodian for any of the Collateral or any of Borrower's other assets and the same is not dismissed within thirty (30) days after the application therefor;

h) An application is made by Borrower for the appointment of a receiver, trustee or custodian for any of the Collateral or any of Borrower's other assets; or a petition under any section or chapter of the Bankruptcy Code or any similar law or regulation is filed by or against Borrower or any guarantor of the Obligations and, if filed against Borrower or any guarantor, is not dismissed within thirty (30) days after filing; or Borrower makes an assignment for the benefit of its creditors or any case or proceeding is filed by or against Borrower for its dissolution, liquidation, or termination; or Borrower ceases to conduct its business as conducted immediately after receiving the first Disbursement hereunder, or is enjoined, restrained or in any way prevented by court order from conducting all or any material part of its business affairs;

i) Borrower becomes insolvent or fails generally to pay its debts as they become due; or

j) There shall occur a default under any of the Notes or any of the other Loan Documents.

7.2 Default Rate.  After the occurrence and during the continuation of any Event of Default, all Obligations outstanding as of the date of such Event of Default will accrue interest at the Default Rate,

in Lender's sole discretion, with prior notice to Borrower. This provision does not constitute a waiver of any Event of Default or an agreement by Lender to permit any late payments whatsoever. The "**Default Rate**" is the lesser of Thirty Percent (30%) per annum and the maximum legal rate of interest applicable to this Agreement in the state where it is to be performed.

7.3 Remedies.  Upon the occurrence or during the continuation of any Event of Default, Lender shall have the following rights, the failure by Lender to exercise any of which shall not constitute waiver of any Event of Default:

a) The right to declare all or any portion of the Loan and all other Obligations then outstanding to be due and payable, whereupon all of the aggregate principal of the Loan, all accrued and unpaid interest thereon, and all Obligations under this Agreement, the Notes and the other Loan Documents shall become due and payable immediately, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by Borrower;

b) The right to exercise all or any portion of the rights and remedies of a secured party under the Delaware Uniform Commercial Code or other applicable law, all of which rights and remedies shall be cumulative and non-exclusive to the extent permitted by law, and in addition to any other rights and remedies contained in this Agreement;

c) The right to (i) peacefully enter upon the premises of Borrower or any other place or places where the Collateral is located and kept, without any obligation to Borrower or any other person, through self-help and without judicial process or first obtaining a final judgment or giving Borrower notice and opportunity for a hearing on the validity of Lender's claim, and remove the Collateral from such premises and places to the premises of Lender or any agent of Lender, for such time as Lender may require to collect or liquidate the Collateral, and/or (ii) require Borrower to assemble and deliver the Collateral to Lender at a place to be designated by Lender;

d) The right to sell, lease or otherwise dispose of any of the Collateral in its then condition, or after any further manufacturing or processing, at public or private sale or sales, with such notice as provided in lots or in bulk, for cash or on credit, all as Lender, in its sole discretion, may deem advisable. At any such sale or sales of the Collateral, the Collateral need not be in view of those present and attending the sale, nor at the same location at which the sale is being conducted. Lender shall have the right to conduct such sales on Borrower's premises or elsewhere and shall have the right to use Borrower's premises without charge for such sales for such time or times as Lender may see fit.  Lender is granted a license or other right to use, without charge, Borrower's labels, patents, copyrights, rights of use of any name, trade secrets, trade names, trademarks and advertising matter, or any property of a similar nature, as it pertains to the Collateral, in advertising for sale and selling any Collateral, and Borrower's rights under all licenses and all franchise agreements shall inure to Lender's benefit but Lender shall have no obligations thereunder. Lender may purchase all or any part of the Collateral at public or, if permitted by law, private sale and, in lieu of actual payment of such purchase price, may set-off the amount of such price against the Indebtedness. The proceeds realized from the sale of any Collateral shall be applied first to the

reasonable costs, expenses and attorneys' and paralegals' fees and expenses incurred by Lender for collection and for acquisition, completion, protection, removal, storage, sale and delivery of the Collateral; second, to other fees and costs of Lender with respect to collecting upon or enforcing the Loan and this Agreement; third, to any accrued and unpaid interest on the Loan; fourth to any unpaid principal balance of the Loan; and, thereafter, any surplus shall be disbursed to Borrower. If any deficiency shall arise, Borrower shall remain liable to Lender therefor.

7.4 Notices.  Borrower agrees that any notice required to be given by Lender of a sale, lease, other disposition of any of the Collateral or any other intended action by Lender, which is personally delivered to Borrower or which is deposited in the United States mail, postage prepaid and duly addressed to Borrower at the address set forth in Section 8.1, at least ten (10) days prior to any such public sale, lease or other disposition or other action being taken, or the time after which any private sale of the Collateral is to be held, shall constitute commercially reasonable and fair notice thereof to Borrower.

8. MISCELLANEOUS.

8.1 Notices.  Any notice required or permitted to be given under this Agreement may be, and shall be deemed, given and sent when deposited in the United States mail, postage prepaid, or deposited with a nationally recognized overnight courier, charges prepaid, transmitted by electronic mail with acknowledgment by recipient, or by telefacsimile with confirmation of receipt, addressed:

To Borrower as follows:
Wingsail Holdings, LLC
Phone:310-402-4960
Email:apolsky@alterrecovery.com

To Lender as follows:
Jordan Mallin
Email: jmallin11@gmail.com

8.2 Successors.  This Agreement shall bind and inure to the benefit of the parties hereto and their respective successors and assigns; provided, however, that Borrower shall not assign this Agreement or any of the rights, duties or obligations of Borrower hereunder without the prior written consent of Lender.

8.3 Waivers.  No consent or waiver under this Agreement shall be effective unless in writing.  No waiver of any breach or default shall be deemed a waiver of any breach or default thereafter occurring.

8.4 Governing Law; Jurisdiction; Venue.  This Agreement shall be governed and interpreted in accordance with the laws of the State of California, as such laws are applied to agreements between residents of California to be performed entirely within that state.  Each party hereby consents to exclusive jurisdiction of and exclusive venue in the courts of Orange County, California.  The prevailing party in any arbitration or other legal action shall be entitled to reimbursement of all costs of the

arbitration or legal action, including but not limited to filing fees and expenses, arbitrator fees and expenses, and reasonable attorneys' fees and expenses.

8.5 WAIVER OF JURY TRIAL, ETC.  TO THE EXTENT LEGALLY PERMISSIBLE, EACH PARTY HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM CONCERNING ANY RIGHTS UNDER THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS, OR UNDER ANY AMENDMENT, WAIVER, CONSENT, INSTRUMENT, DOCUMENT OR OTHER AGREEMENT DELIVERED OR WHICH IN THE FUTURE MAY BE DELIVERED IN CONNECTION THEREWITH, OR ARISING FROM ANY FINANCING RELATIONSHIP EXISTING IN CONNECTION WITH THIS AGREEMENT, AND AGREES THAT ANY SUCH ACTION, PROCEEDINGS OR COUNTERCLAIM SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.  BORROWER CERTIFIES THAT NO OFFICER, REPRESENTATIVE, AGENT OR ATTORNEY OF LENDER HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT LENDER WOULD NOT, IN THE EVENT OF ANY ACTION, PROCEEDING OR COUNTERCLAIM, SEEK TO ENFORCE THE FOREGOING WAIVERS.  BORROWER HEREBY ACKNOWLEDGES THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR LENDER ENTERING INTO THIS AGREEMENT.

8.6 Indemnification.  If after receipt of any payment of all or part of the Obligations, Lender is for any reason compelled to surrender such payment to any person or entity, because such payment is determined to be void or voidable as a preference, impermissible setoff, or diversion of trust funds, or for any other reason, this Agreement will continue in full force and effect and Borrower will be liable to, and will indemnify, save and hold Lender and its officers, directors, members, attorneys, employees, contractors, and agents harmless of and from the amount of such payment surrendered.  The provisions of this Section will be and remain effective notwithstanding any contrary action that may have been taken by Lender in reliance on such payment, and any such contrary action so taken will be without prejudice to Lender's rights under this Agreement and will be deemed to have been conditioned upon such payment becoming final, indefeasible and irrevocable.  In addition, Borrower will indemnify, defend, save and hold Lender and its officers, directors, members, attorneys, employees, contractors, and agents harmless of, from and against all claims, demands, liabilities, judgments, losses, damages, costs and expenses, joint or several (including all accounting fees and attorneys' fees reasonably incurred), that Lender or any such indemnified party may incur arising out of this Agreement, the Notes, any other Loan Documents or any act taken by Lender hereunder except for the willful misconduct or gross negligence of such indemnified party. The provisions of this Section will survive the termination of this Agreement.

8.7 Construction.  The headings of this Agreement are for convenience only and are not to be considered in construing this Agreement.  The language of this Agreement shall be construed according to its fair meaning and not strictly for or against any party.

8.8 Entire Agreement. This Agreement and any agreement, document or instrument attached hereto or referred to herein integrates all the terms and conditions mentioned in or incidental to this Agreement, and supersedes all oral negotiations and prior writings in respect to the subject matter of

this Agreement.  In the event of any conflict between the terms, conditions and provisions of this Agreement and any such agreement, documents or instrument, the terms, conditions and provisions of this Agreement shall prevail.

8.9 Counterparts and Facsimile Signatures.  This Agreement may be executed in one or more counterparts and each of such counterparts shall be deemed to be an original for all purposes, and all of such counterparts shall together constitute one and the same document.  Any signature required for the execution of this Agreement may be in the form of either an original signature or a facsimile transmission bearing the signature of any party to this Agreement.  No objection shall be raised as to the authenticity of any signature due solely to the fact that said signature was transmitted via facsimile.

IN WITNESS WHEREOF, Borrower and Lender have executed this Loan and Security Agreement as of the day and year first above written.

BORROWER:

WINGSAIL HOLDINGS

A Washington limited liability company

By:_____*Fu Shen Chang*_____ Fu Shen Chang, Manager

LENDER:

MR. JORDAN MALLIN

A California Resident

By:_____*Jordan Mallin*_____ Mr. Jordan Mallin

**EXHIBIT A**

**FORM OF SECURED PROMISSORY NOTE**

U.S.$150,000 Seattle, Washington

April 10, 2019

FOR VALUE RECEIVED, WINGSAIL HOLDINGS, LLC, a WASHINGTON limited liability company ("Maker"), promises to pay to Mr. Jordan Mallin, a California Resident ("Holder"), at 85 Beachmont, San Francisco, CA 94132, or at such other address as may be specified in writing by Holder to Maker, the principal sum of ONE HUNDRED FIFTY THOUSAND DOLLARS ($150,000), pursuant to that certain Loan and Security Agreement dated as of April 10, 2019 (the "Agreement"), by and between Maker and Holder. Commencing on the date hereof, interest shall accrue hereon at the rate of 5 percent (5%) for the initial 60 days, or Six Hundred Twenty Five tenths of a percentage point (.625%) per week, computed on the weekly unpaid principal amount of this Secured Promissory Note (this "Note"), accruing until all principal and interest has been paid. Accrued interest on the outstanding unpaid principal amount shall be payable upon maturity or until the Termination Date. On the Termination Date, all outstanding principal and any accrued and unpaid interest hereunder shall be paid in full. Principal and interest are payable in lawful money of the United States in immediately available funds. All payments on this Secured Promissory Note (this "Note") shall be made in lawful money of the United States of America.

1. Loan and Security Agreement. This Note is issued pursuant to the terms and provisions of the Agreement. All of the obligations of Maker hereunder are secured by all of its assets, including all real and personal property of Maker, as further set forth in the Agreement. Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in the Agreement.

2. Events of Default. Upon the occurrence and during the continuance of an Event of Default, Holder shall be entitled, to declare this Note to be due and payable, whereupon all of the aggregate principal under the Note, and all accrued and unpaid interest thereon shall become due and payable immediately, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by Maker. Holder shall furthermore be entitled, from and after the occurrence of the Event of Default, to charge interest at the Default Rate on the outstanding defaulted amount. Holder shall have the rights set forth in this Section 2 in addition to any other rights or remedies Holder may have under the Agreement and under the laws of the State of Delaware.

3. Prepayments. This Note may be prepaid in accordance with Section 2.7 of the Agreement.

4. Costs and Expenses of Collection. If this Note is collected by or through an attorney at law as a result of a failure of Maker to pay, when due hereunder, any payment of principal of this Note, Maker shall pay all of Holder's reasonably incurred costs of collection including, but not limited to, Holder's reasonable attorneys' fees. If Maker fails to pay any such costs in a timely manner, Holder is entitled to disburse such sums as a loan under this Note. Thereafter, the costs will bear interest from the date

incurred or disbursed at the highest rate set forth herein. This provision will survive the termination of this Note and the repayment of any amounts due or the performance of any obligation hereunder.

5. Seniority. This Note shall be *pari passu* with all secured promissory notes made to evidence indebtedness pursuant to the Agreement. Other than indebtedness pursuant to the Agreement and the Senior Loan Documents, the Maker shall not incur, assume or guarantee any indebtedness that is senior to or *pari passu* with the indebtedness evidenced by this Note without the prior written consent of the Holder.

5. Subordination. Anything to the contrary in this Note or the Agreement notwithstanding, Holder hereby agrees that Maker's obligations under this Note and the Agreement are subordinated and made junior to Maker's obligations to Senior Lender. Holder will take such further action (including executing and delivering subordination agreements or such further instruments and documents) as Maker or its lenders, investors, or other financiers reasonably may request.

6. Waivers by Maker. Maker waives presentation for payment, demand, notice of demand, notice of nonpayment or dishonor, protest and notice of protest of this Note, and all other notices in connection with the delivery, acceptance, performance, default, or enforcement of the payment of this Note; liability hereunder shall be unconditional and shall not be affected in any manner by any indulgence, extension of time, renewal, waiver, or modification granted or consented to by Holder. No waiver of any payment under this Note shall operate as a waiver of any other payment.

7. Effect of Delay or Waiver by Holder. No delay or failure of Holder in the exercise of any rights or remedy provided for hereunder shall be deemed a waiver of any other right or remedy that Holder may have.

8. Notices. Any notice or demand to a party hereunder shall be made in accordance with the Agreement.

9. Governing Law; Jurisdiction; Venue. This Note shall be governed and interpreted in accordance with the laws of the State of Delaware, as such laws are applied to agreements between residents of Delaware to be performed entirely within the State of Delaware. Holder and Maker hereby consent to jurisdiction of and venue in the courts of the State of Delaware. The prevailing party in any arbitration or other legal action shall be entitled to reimbursement of all costs of the arbitration or legal action, including but not limited to filing fees and expenses, arbitrator fees and expenses, and reasonable attorneys' fees and expenses.

"MAKER"
Wingsail Holdings, LLC

By: *Fu Shen Chang* _____
Fu Shen Chang, Manager

"HOLDER"
Mr. Jordan Mallin

By: *Jordan Mallin* _____
Mr. Jordan Mallin

10. WAIVER OF JURY TRIAL, ETC.  TO THE EXTENT LEGALLY PERMISSIBLE, HOLDER AND MAKER HEREBY WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM CONCERNING ANY RIGHTS UNDER THIS NOTE, THE AGREEMENT OR THE OTHER LOAN DOCUMENTS, OR UNDER ANY AMENDMENT, WAIVER, CONSENT, INSTRUMENT, DOCUMENT OR OTHER AGREEMENT DELIVERED OR WHICH IN THE FUTURE MAY BE DELIVERED IN CONNECTION THEREWITH, OR ARISING FROM ANY FINANCING RELATIONSHIP EXISTING IN CONNECTION WITH THIS NOTE, AND AGREES THAT ANY SUCH ACTION, PROCEEDINGS OR COUNTERCLAIM SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.  MAKER CERTIFIES THAT NO OFFICER,
REPRESENTATIVE, AGENT OR ATTORNEY OF HOLDER HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT HOLDER WOULD NOT, IN THE EVENT OF ANY ACTION, PROCEEDING OR COUNTERCLAIM, SEEK TO ENFORCE THE FOREGOING WAIVERS.  MAKER HEREBY ACKNOWLEDGES THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR HOLDER ENTERING INTO THIS NOTE.

11. Headings.  The Section headings in this Note are for convenience of reference only, and shall not be considered in, nor shall they affect, the interpretation or application of any of the provisions of this Note.

12. Time of Performance.  In performing any act under this Note, time shall be of the essence.

EXECUTED by the undersigned, each through its duly authorized agent, as of the date first above stated.

# Signature Certificate

Document Ref.: GTGSV-4HFN3-2DMFC-QJRIW

Document signed by:

| | Jordan Mallin | |
|---|---|---|
| | Verified E-mail:<br>jmallin11@gmail.com | *Jordan Mallin* |
| | IP 107.77.212.191 | Date 10 Apr 2019 19:58:14 UTC |

| | Fu Shen Chang | |
|---|---|---|
| | Verified E-mail:<br>max@ascfund.com | *Fu Shen Chang* |
| | IP 108.41.11.39 | Date 10 Apr 2019 21:33:55 UTC |

Document completed by all parties on
10 Apr 2019 21:33:55 UTC
Page 1 of 1

Signed with PandaDoc.com

PandaDoc is the document platform that boosts your
company's revenue by accelerating the way it transacts.